NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KURT BRIGLIADORA, | : : : Civil Action No. 08-5830 (PGS) |
| Plaintiff, | : : |
| v. | : : OPINION |
| COMMISSIONER OF SOCIAL SECURITY, | : : |
| Defendant. | : : |

SHERIDAN, U.S.D.J.

This matter is before the Court on Plaintiff, Kurt Brigliadora's ("Plaintiff") appeal of the final decision of the Commissioner of Social Security ("Commissioner") denying his June 9, 2005 application for disability insurance benefits. Plaintiff's disability allegedly began January 1, 2005 due to the Human Immunodeficiency Virus ("HIV/AIDS"),[1] post-herpetic neuralgia ("PHN") and adjustment disorder with depression. After a hearing, ALJ Farley ("ALJ") denied Plaintiff's application by a final decision dated May 16, 2008.

I.

Mr. Brigliadora is a high school graduate who is 48 years old. He is 5'11" and weighs approximately 180 pounds. At the time of his application for disability insurance benefits, he

---

[1] AIDS is a disease which has adversely impacted more than 1 million American households and families. www.cdc.gov/hiv/resources/factsheets/us.htm. While its course and treatment hurt many, disability is based upon the guidelines found in the Commissioner's Listing of Impairments.

lived by himself in Elizabeth, New Jersey in a rented garage. Sometime in 2007, he began living with a friend and the friend's girlfriend. Plaintiff worked as a self-employed painter/laborer from 1990 through 2004 where he painted and performed other basic labor jobs for construction companies. As a painter/laborer the heaviest weight he lifted was 50 pounds, and most frequently lifted objects weighing about 10 pounds. He had no supervisory duties, and earned approximately $8.00 - $12.00 an hour. He also worked on a conveyer belt for a fish processor in Alaska for one year (1996).

At the time of his application, Plaintiff complained that he lacked energy and strength. He complained of bone, joint, neck and shoulder pain, and indicated that his medications cause him to be nauseous. He had lost interest in day to day activities, and focused on hoping for a cure for his illness (HIV/AIDS). He described his daily activities as waking up and walking along Broad Street in Elizabeth where he would stop and rest on the steps of the Post Office or a church if he became tired. At maximum, he would walk up to a mile. He shops for food, and can carry two bags of groceries home. He reported being depressed and unable to sleep more than 1 or 2 hours at a time. He fails to regularly undertake appropriate care of his personal needs; but while living in the garage, he prepared his own meals which consisted of cold foods since he did not have a stove. He avoids social activities because he is afraid to be around bacteria and germs due to his HIV/AIDS.

Plaintiff's medications include Atripla or Truvada (for HIV/AIDs), Bactrum (an antibiotic), Lipitor (for lowering cholesterol), Ambien (a sleep aid), Clonazepan (for seizures and anxiety), Lexapro or Zoloft once a day (for depression) and Gabapentin twice a day (for pain relief).

Since 2005, Plaintiff has regularly visited Trinitas Hospital HIV Services, Early Intervention Program for medications and treatment. (R. 217-27). A July 6, 2005 medical report confirmed that Plaintiff was infected with the HIV virus. (R. 206-08). At that time, Plaintiff had no opportunistic or indicator diseases, such as bacterial, fungal, or viral infections (such as herpes zoster). Plaintiff had no difficulty with daily activities, social functioning, concentration, persistence or pace. (R. 206-08).

On August 24, 2005, Plaintiff was seen by Justin Fernando, M.D. for an internal medicine examination. (R. 234-238). On examination, Plaintiff complained of post-herpaetic neuralgia and a burning sensation in his legs where lesions had occurred. He complained of extreme lethargy, body pain and nauseousness. He also complained of mild lower back spasms. His blood pressure was 140/90, and vision was 20/20 in both eyes. According to Dr. Fernando, Plaintiff appeared to be in no acute distress, had a normal gait and walked heels to toes without difficult. He needed no support getting on or off the examining table and used no assistive devices. The skin on his left leg revealed flat lesions that had previously been blisters, but no significant enlargement of lymph nodes was evident. His head, eyes, ears, neck, chest, heart, and abdomen were all normal. The musculoskeletal system examination was normal. He had full range of motion in shoulders, elbows, wrists and strength of 5/5 in both his upper and lower extremities. Joints were stable and non-tender. Hand and finger dexterity was intact. Dr. Fernando found Plaintiff to be depressed and quite disappointed in himself due to his illness. (R. 237). Psychiatric treatment was recommended due to his inability to reconcile with his condition.

On September 20, 2005, Plaintiff was examined by Dr. Uwe Schmidt of the Trinitas Hospital Early Intervention Clinic at the request of the Division of Disability Determinations. At

3

the time of the examination, Plaintiff's ability to stand, walk, lift, and handle objects was intact. He was limited to carrying no more than 25 pounds. He had some limitation maintaining sustained concentration and persistence, but was found to have no limitations in understanding, memory or social interaction. On March 16, 2006 Dr. Schmidt again opined that Plaintiff was limited in his ability to lift and carry more than 25 pounds; but Plaintiff could stand up to 2 hours per day, sit up to 8 hours per day, and was unlimited in his ability to use push/pull controls. Two months later, Dr. Schmidt found that Plaintiff was ambulatory, alert and oriented to time, place and person. Plaintiff complained of a headache and dizziness in the mornings, and pain in his bones, neck and shoulders at all times.

On September 22, 2005, Plaintiff was seen by Jan S. Cavanaugh, Ph. D. of Industrial Medicine Associates for a psychiatric evaluation. At the time of evaluation, Plaintiff reported no history of psychiatric hospitalizations. He stated that he slept normally except for waking a few times a night to go to the bathroom. He is able to dress, bathe and groom himself. He stated his appetite was normal and he ate every hour or so to avoid nausea. He admitted to symptoms of depression including dysphoric mood, psychomotor retardation, irritability, psychomotor agitation, fatigue and a loss of energy as well as feelings of worthlessness, diminished self esteem, problems with memory and concentration and a diminished sense of pleasure. He was anxious about his lifestyle, and his future illness. He used eye contact appropriately and his speech was fluent. His thought processes were coherent and goal directed without evidence of delusions, hallucinations or disordered thinking. Dr. Cavanaugh found Plaintiff's attention and concentration were intact, but his recent and remote memory skills were mildly impaired. His intellectual range was found to be average. His insight and judgment were good. Vocationally,

he appeared to be capable of following and understanding simple instructions and directions, performing simple and complex tasks, and could regularly attend to a routine and interact appropriately with others. (R. 240). Dr. Cavanaugh found that his psychiatric symptoms may significantly interfere with Plaintiff's ability to function on a daily basis. The diagnosis was major depressive disorder without psychotic features. It was recommended that Plaintiff become involved with treatment to deal with his psychiatric symptoms. His prognosis was fair.

On September 30, 2005, Dr. Judith Belsky, a psychiatrist, reviewed the relevant medical records and completed a psychiatric review technique form ("PRTF"). Dr. Belsky opined that Plaintiff's depression was a medically determinable impairment which was not severe. Dr. Belsky assessed that Plaintiff had mild difficulties in his ability to maintain social functioning and maintain concentration, persistence, and pace.[2] He had no restrictions on his activities of daily living, and had never had repeated episodes of deterioration for extended duration. On June 22, 2006, Dr. William Rook reviewed the relevant reports and Dr. Belsky's PRTF, and concurred with her opinion.

On June 1, 2006 Plaintiff was seen by Ernesto Perdermo, Ph.D. for a complete mental status examination. Plaintiff stated that he was angry and depressed all of the time, and he is tired and fatigued with little interest or motivation. Plaintiff stated that he was always in pain. He walked 15-20 blocks to the doctor's office, and appeared casually dressed, but was somewhat ungroomed and disheveled. His thought processes were organized, focused and coherent. There

---

[2] The Commissioner assesses the severity of medically-determinable mental impairment(s) using the four criteria in paragraph B of the Listing of Impairments: Activities of daily living, social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.C

was no indication of a thought disorder or psychosis. Short term memory was fair. Long term memory was good. Concentration was good, and his intelligence seemed to be in the average range. Plaintiff's diagnosis was chronic adjustment disorder with degressive mood secondary to AIDS. Dr. Perdermo rated Plaintiff's GAF as a 70[3], but felt that his AIDS and very low t-cell count and herpes may affect his ability to function at any job. (R. 288).

On March 9, 2007, subsequent to an event where he suffered heart and chest pain, an echocardiogram revealed generally normal results with abnormal diastolic relaxation, and no evidence of mitral regurgitation. On September 10, 2007, Dr. Robert Carducci examined Plaintiff, noting that Plaintiff was well-developed and well-nourished. No abnormalities were found in his eyes, neck, lungs, abdomen, or extremities. Plaintiff's heart had a regular rhythm, and no left or right ventricular impulse palpable. (R. 307).

The Physical Residual Functional Capacity Assessment ("RFC") dated April 10, 2006 found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk about 6 hours in an 8 hour day; and Plaintiff was found to be unlimited in his ability to push/pull. He had no postural, manipulative, visual, communicative, or environmental limitations. (R. 279-282).

II.

A claimant is considered disabled under the Social Security Act if he is "unable to engage

---

[3] A GAF of 61 to 70 indicates that the individual has some mild symptoms or some difficulty in social, occupational or school functioning, but is generally functioning pretty well, and has some meaningful interpersonal relationships. American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders-Text Revision (DSM-IV), 34 (4th Ed. 2000).

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. §423(d)(2)(A); *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. §405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability. 20 C.F.R. § 404.1520. First, the plaintiff must establish that he is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied. See *Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)). In step two, if the plaintiff is not working, he must establish that he suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment

found in "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*; *Burnett*, 220 F.3d at 118-20. If it does, the plaintiff is automatically disabled. 20 C.F.R. §404.1520(d). But, the plaintiff will not be found disabled simply because he is unable to perform his previous work. *Id.* In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning. *Burnett*, 220 F.3d at 119-20. A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review." *Id.* at 119.

If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five. *Plummer*, 186 F. 3d at 428. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform [his or] her past relevant work." *Id.*; *see Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity ("RFC"); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.

If the plaintiff cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. See 20 C.F.R. § 404.1520(g); If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *See Yuckert*, 482 U.S. at 146 n.5; *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the

national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience. 20 C.F.R. §404, subpt. P, app.2. However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett,* 220 F.3d at 126. If this evidence establishes that there is work that the plaintiff can perform, then he is not disabled. 20 C.F.R. § 404.1520(g).

### III.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see also* 42 U.S.C. § 405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g)*; Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla.

*Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422.  Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9

The reviewing court must view the evidence in its totality.  *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983));  *See Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder.").  A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360.  But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. § 401, *et seq*. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability.  *See* 20 CFR § 404.1529.  Therefore, claimant must prove that his or her impairment is medically determinable and

cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . .[one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b). *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

### IV.

The Plaintiff raises four points on appeal. They are (1) the record substantiates a severe psychiatric impairment; (2) at the third step of the sequential process, the decision does not compare the combination of Plaintiff's impairments to any particular listing; (3) the ALJ's conclusion that Plaintiff could perform a full range of sedentary work is not based on substantial evidence; and (4) the Commissioner failed to carry his burden at the fifth step of the sequential process.

Each of these contentions is discussed below.

### Point 1

Contrary to the ALJ's decision, the Plaintiff contends that the record substantiates a severe psychiatric impairment. The Court finds that the ALJ relied on substantial evidence in determining that the psychiatric impairment was not severe. The ALJ noted:

> [a] review of the record finds no significant mental limitations found by any examiner. The claimant has full daily living activities and was given a GAF for 70 indicating only mild impairment with social and/or occupational functioning (Exhibits 4F, 10F). Consequently, I do not find the claimant's depression to be a severe impairment.

11

In addition to the finding above, the record shows that Dr. Belsky found Plaintiff's depression was not severe. According to Dr. Belsky, Plaintiff had only mild difficulties in social functioning and concentration and found no repeated episodes of deterioration. Dr. Rook reviewed the medical records and agreed with Dr. Belsky's findings. Moreover, Dr. Perdermo found Plaintiff to be of average intelligence, and his GAF was rated at 70 indicating mild symptoms or some difficulty in social, occupational or school functioning, but that Plaintiff is generally functioning pretty well, and has some meaningful interpersonal relationships.

The ALJ's reliance on the evidence from Doctors Belsky, Rook and Perdermo is substantial evidence that the Plaintiff's psychiatric impairment was not severe.

### Point 2

Plaintiff's second argument is that the ALJ does not compare the "combination of Plaintiff's impairments to any particular listing" at Step 3 of the sequential process. The Plaintiff argues that his HIV/AIDS and compromised immune system has resulted in herpes zoster, chronic pain, fatigue, nausea, fever and sweats, and that these conditions should have been considered together when evaluating his alleged disability.

In his decision, the ALJ reviewed listing 14.08 for the human immunodeficiency virus:

> Listing 14.08 for human immunodeficiency virus infection requires bacterial infections, fungal infections, protozoan or helminthic infections, viral infections, malignant neoplasms, conditions of the skin or mucous membranes, hematologic abnormalities, neurological abnormalities, HIV wasting syndrome, diarrhea, cardiomyopathy, nephropathy, other infections resistant to treatment or requiring hospitalization, or repeated manifestations of HIV infection resulting in restriction of activities of daily living, difficulties in maintaining

>
> social functioning or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.

The Plaintiff suggests that the ALJ should have considered paragraph 14.08(d) wherein presumptive disability is to be awarded to any applicant establishing that he suffers from an HIV infection causing "herpes zoster, either disseminated or multi-dermatomal eruptions that are resistant to treatment." Herpes zoster is like shingles, characterized by a series of eruptions of groups of vesicles which cause pain. On August 25, 2005, Dr. Fernando diagnosed Plaintiff with "post-herpaetic neuralgia and burning sensations in his legs where the lesions occurred." Despite this finding, Dr. Fernando does not state that the "eruptions are resistant to treatment" as the listing requires. The lesions appear to be healed. Hence, utilization of mild or healed herpes zoster combined with HIV/AIDS to find disability is not warranted.

Point 3

Plaintiff's third argument is that the finding that Plaintiff could perform a "full range of sedentary work is not based on substantial evidence." Generally, the Regulations define the meaning of a "severe impairment" by explaining what is meant by non-severe impairments. It states:

> What we mean by an impairment(s) that is not severe:
>
> (a)   Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b)   Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.
>
> Examples of these include—
>
> (1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

      (2)      Capacities for seeing, hearing, and speaking;

      (3)      Understanding, carrying out, and remembering simple instructions;

      (4)      Use of judgment;

      (5)      Responding appropriately to supervision, co-workers and usual work situations; and

      (6)      Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.

When applying this standard, the evidence bolsters the ALJ's decision. Plaintiff can do all the tasks suggested in the Regulations. He can see, walk, lift, push, speak and understand in appropriate measures. There is no combination of diseases that render Plaintiff unable to do sedentary work. The ALJ's decision is based on substantial evidence.

In support of the ALJ's conclusions, it is noted that Dr. Schmidt found Plaintiff could lift 25 pounds and had "no limitations in understanding, memory and social interaction." Dr. Fernando found Plaintiff had a full range of motion. Dr. Perdermo found Plaintiff functioning well with a GAF of 70, but thought his HIV/AIDS may affect his ability to work. Overall, the record more than adequately supports the ALJ's ruling that Plaintiff can perform sedentary work.

### Point 4

Lastly, the Plaintiff argues that the Commissioner failed to meet his burden at Step 5 of the sequential process. Plaintiff argues that since there was a severe non-exertional mental impairment, the Commissioner could not use the "grids" and erred by failing to retain a vocational expert.

The ALJ's determination was that Plaintiff "could perform the full range of unskilled, sedentary work with no nonexertional limitation resulting from his medically determinable mental

14

impairment that impacted his occupational base." This conclusion is well supported. As Dr. Cavanaugh's and Dr. Perdomo's findings indicate, Plaintiff retained the ability to perform the mental requirements of unskilled work, including understanding, remembering, and carrying out simple instructions. In addition, he could make simple work-related decisions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting (R. 238-41, 285-88). See SSR 96-9p. A full range of sedentary work includes all of the approximately 200 unskilled, sedentary occupations, administratively noticed in the Grid Rules. SSR 96-9p. Thus, the ALJ properly utilized Grid Rule 201.28, based on Plaintiff's vocational profile and RFC, to reach the conclusion that Plaintiff could perform sedentary work and there was no non-exertional disability found. (R. 18-19). See 20 C.F.R. § 416.969; *Heckler v. Campbell*, 461 U.S. 458 (1983).

## CONCLUSION

The decision of the ALJ is affirmed. The complaint is dismissed with prejudice.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.


April 23, 2010